**IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

Allstate Financial Services, LLC,

                Plaintiff,

     v.

Michael P. Nolan,

                Defendant.

Case No.  4:23-cv-01015

**VERIFIED COMPLAINT**

Plaintiff Allstate Financial Services, LLC ("AFS"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant Michael P. Nolan ("Nolan"):

**NATURE OF THE ACTION**

1.      This action is the result of Nolan failing to comply with certain promises he made and obligations he owes AFS. Nolan executed a Registered Representative Agreement ("Agreement") with AFS on May 16, 2013 (attached as Exhibit A). The Agreement allowed Nolan to market and sell AFS registered products and services (jointly, "products"), to receive AFS Confidential Information (defined below), and to receive compensation for the sale of AFS products.

2.      Pursuant to the Agreement, Nolan agreed that, for one year following the termination of his relationship with AFS, he would not solicit the purchase of registered products in competition with those sold by AFS or induce or advise any AFS customer to lapse, surrender, or cancel any coverage: (a) with respect to any AFS customer to whom Nolan sold registered products on behalf of AFS and who is a customer of AFS at the time of termination of the Agreement, (b) to any AFS customer known by Nolan as a result of his status as an AFS Registered

1

Representative or his access to AFS Confidential Information,[1] and (c) from any office or business site located within one mile of where he solicited or sold registered products on behalf of AFS.

3.      The Agreement further required Nolan to acknowledge that he would be granted access to AFS Confidential Information, that AFS Confidential Information is the property of AFS, and that he would not disclose to any third party or permit any third party to access AFS Confidential Information. Nolan also agreed to return all AFS property, including AFS Confidential Information, upon termination of his relationship with AFS.

4.      Effective July 19, 2023, Nolan's Agreement and his relationship with AFS terminated. Although his relationship terminated, Nolan chose to ignore (and continues to ignore) the obligations set forth in his Agreement.

5.      AFS recently learned that Nolan is working for Sequent Planning, LLC ("Sequent Planning"), one of AFS's competitors. In doing so, Nolan is soliciting AFS customers to terminate their relationships with AFS and purchase competing insurance and financial products from Sequent Planning.  Given the large number of solicitations of AFS customers, Nolan appears to be using AFS Confidential Information in his solicitations.

6.      In fact, Nolan moved his FINRA and SEC Investment Adviser registrations to Sequent Planning on July 17, 2023, two days before he terminated his relationship with AFS.

7.      Prior to his departure from AFS, Nolan (or someone working at his direction) accessed, printed, and copied confidential AFS customer information in order to take the information with him to AFS competitor Sequent Planning.

8.      Not surprisingly then, Nolan did not return this information to AFS when his Agreement and relationship with AFS terminated. Instead, Nolan stole the information and is using

---

[1] The AFS customers identified in (a) and (b) are collectively referred to as "AFS customers."

that information to actively solicit AFS customers through both written and verbal communications.

9.      Nolan's actions are a clear violation of his Agreement and the law. Consequently, AFS now brings suit against Nolan for breach of the Agreement, misappropriation of AFS trade secrets, and tortious interference. In doing so, AFS requests that this Court enter an order restraining and enjoining Nolan from continuing his knowing and intentional breach of his Agreement, and award AFS damages for Nolan's unlawful acts.

10.      AFS requests that this Court enter an order (1) restraining and enjoining Nolan, and anyone acting in concert with him, from soliciting the purchase of registered products competitive to those offered by AFS; (2) restraining and enjoining Nolan, and anyone acting in concert with him, from soliciting AFS customers; (3) compelling Nolan to return all AFS property, including all AFS Confidential Information, in his custody, possession, or control to AFS; (4) restraining and enjoining Nolan, and anyone acting in concert with him, from using, possessing, or accessing AFS Confidential Information; (5) awarding AFS compensatory and punitive damages for Nolan's intentional acts; and (6) awarding AFS its reasonable attorneys' fees as provided for under the Agreement and the law.

## THE PARTIES AND RELEVANT PERSONS

11.      AFS is a limited liability company organized under the laws of the state of Delaware. Its principal place of business is located in Lincoln, Nebraska. AFS's sole member is Allstate Insurance Company, which is incorporated in Delaware and has its headquarters in Illinois.  Accordingly, AFS is a citizen of Delaware and Illinois.

12.      Nolan is a citizen of the State of Missouri and resides at 4464 Dantonaire Place, St. Louis, MO 63128.

3

13.     Sequent Planning, LLC ("Sequent Planning") is a Nebraska-based financial planner. Sequent Planning is an AFS competitor.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because AFS's claims against Nolan under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* raise a Federal question.  AFS's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the Federal question that they form part of the same case or controversy.

15.     Alternatively, the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because this action and controversy is between citizens of different states and exceeds the sum or value of $75,000.00, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Nolan because he is a citizen and resident of Missouri. Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) because Nolan resides in this District, a substantial part of the events giving rise to AFS's claims occurred in this District, and the AFS property that AFS seeks to be returned is located in this District.

## BACKGROUND

### AFS's Business and Hiring of Independent Agents and Service Providers

17.     AFS is one of the nation's leading providers of financial products and services to individuals and businesses. AFS provides securities, mutual funds, and annuities, among other products.

18.     In addition to providing these products directly, AFS appoints Registered Representatives ("RRs") to sell AFS products.

19.     AFS rigorously screens its RRs to ensure that the representatives are qualified to represent and sell AFS products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate financial solutions.

20.     AFS expends substantial resources advertising, marketing, and promoting its products.

21.     The RRs benefit directly and indirectly from AFS's advertising, marketing, and promotional efforts, as well as from AFS's goodwill, reputation, and name recognition. These efforts and expenditures allow the RRs to develop and cultivate customer accounts and relationships on behalf of AFS.

22.     In addition, Allstate Insurance Company ("AIC") is one of the nation's leading providers of insurance products to individuals and businesses. Among other things, AIC provides automobile, property, and casualty insurance to individuals and businesses. AIC provides these products directly and also appoints independent exclusive agents ("Exclusive Agents"), through its Exclusive Agency Program, to sell its AIC products.

23.     AIC and AFS are affiliated companies. Thus, and in order to assist RRs in selling AFS products, a RR is paired with one or more Exclusive Agents who sell AIC products.

24.     By pairing the RR with multiple Exclusive Agents, the RR is able to sell registered products to AIC automotive, property and casualty insurance customers.

25.     In other words, through AIC and the Exclusive Agents, an RR is introduced to AIC customers for the purpose of selling AFS registered products to AIC customers. An RR would not have access to the AIC customer but for being affiliated with AFS and having AIC and/or the Exclusive Agent introduce the customer to the RR.

26.     AFS relies heavily upon repeat business to maintain its competitive advantage in the highly competitive financial services industry. Maintaining goodwill and a solid business reputation with its customers is a critical component of AFS's success. Because AFS's business is a service business, the relationship that each RR has with AFS customers is highly dependent on the attention and excellent service given to the customers on an ongoing basis, and the continued trust the customers place in AFS as a leading provider of such services.

### Protection of AFS Confidential Information

27.     AFS customers entrust AFS and its RRs to safeguard and protect their private information, which includes information relating to, among other things, their personal data, date of birth, social security numbers, types of products, amount of financial products, premium amounts, renewal dates, description and location of assets and property, claims histories, financial needs, pricing information, and other financial and personal information, from unauthorized use or disclosure. This unique compilation data is part and parcel of what allows AFS to be competitive in the financial services market.

28.     AFS protects its information (described in the paragraph above) by, among other things: limiting the disclosure and use of this information to only the RR who needs this information to sell AFS products (even the RR's employees are expressly denied access to such information unless they also sign a Confidentiality and Non-Competition Agreement with AFS); educating the RR about the requirements and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the RRs to execute written agreements that protect against the misuse and improper disclosure of AFS Confidential Information.

29.     All RRs, pursuant to their agreements with AFS and while performing services under their agreements, acknowledge that they will have access to AFS Confidential Information, promise to not disclose AFS Confidential Information to anyone not authorized to receive it, and confirm that they will not use AFS Confidential Information for their own benefit or for any improper purpose.

30.     RRs also agree, upon termination of their relationship with AFS, to continue treating AFS Confidential Information as confidential, to not disclose, either directly or indirectly, AFS Confidential Information to any third party, and to immediately return all AFS Confidential Information to AFS.

31.     Hence, AFS's Confidential Information is not available to the general public and is closely guarded by AFS.  AFS keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive financial products business.  A RR would not have access to this Information but for being a RR.

**Nolan Enters into the Agreement to Solicit and Sell AFS Products**

32.     After proceeding through AFS's rigorous screening process to become a RR, Nolan became an RR on or about May 16, 2013. (*See* Agreement, Ex. A).

33.     As an RR, Nolan solicited potential and existing AFS customers to purchase AFS products, including variable life insurance policies, variable annuity contracts, mutual funds, and other securities products, from 18102 Chesterfield Airport Road, Suite A, Chesterfield, Missouri ("AFS Location").

34.     Nolan also serviced existing AFS customers' needs, and met with new and potential AFS customers, from the AFS Location.

35.     As explained below, in consideration of Nolan's access to existing and potential AFS customers and AFS Confidential Information, Nolan, pursuant to the Agreement, agreed to protect AFS Confidential Information and to abide by certain reasonable restrictive covenants.

36.     Under his Agreement, Nolan acknowledged that the following information is AFS "confidential information" and property (referred to herein as "Confidential Information"):

> [AFS] business plans; information regarding the names, addresses, and ages of policyholders or customers; types of policies or contracts; amounts of insurance; premium amounts; renewal dates of policies or contracts; policyholder or customer listings and any policyholder or customer information subject to any privacy law; claim information; certain information and material identified by [AFS] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to [AFS] pursuits that is not otherwise lawfully available to the public.

(Agreement, p. 8 ¶ d.)

37.     Pursuant to the Agreement, Nolan agreed that he would not, at any time or in any manner, directly or indirectly, use AFS Confidential Information for any purpose other than to carry out the provisions of the Agreement.  (Agreement, p. 8 ¶¶ b–d.)

38.     Upon information and belief, Nolan kept AFS Confidential Information, such as customer contact information and notes on customer preferences, in paper files that were maintained in file cabinets at the AFS Location and in electronic files that were stored in AFS's confidential database and on Nolan's electronic devices.

39.     Nolan used the AFS Confidential Information that was kept in the paper and electronic files to solicit and service AFS customers.

40.     Pursuant to the Agreement, Nolan acknowledged that all Confidential Information he was provided and had access to as an RR would at all times remain AFS property and was to be returned to AFS upon termination of the Agreement and his relationship with AFS. (Agreement, p. 4 ¶ j; p. 5 ¶ 1 (10); p. 7–8 ¶¶ a–e.)

41.     Pursuant to pages 9 and 10 of the Agreement, Nolan agreed that, for a period of one year following termination of the Agreement, he would not "solicit the purchase of registered products competitive with those sold by AFS or induce or advise any customer to lapse, surrender or cancel any coverage":

- "[W]ith respect to any person, company or organization to whom [Nolan] sold registered products on behalf of AFS and who is a customer of AFS at the time of the termination of this Agreement;"

- "[W]ith respect to any person, company or organization who is a customer of AFS at the time of termination of this Agreement and whose identity was discovered as a result of [Nolan's] status as a registered representative of AFS or as a result of [Nolan's] access to confidential information of AFS;" and

- "[F]rom any office or business site located within one mile of any location from which [Nolan] solicited or sold registered products during the year immediately preceding termination of this Agreement."

(Agreement, p. 9–10 ¶ g.)

42.     Nolan recognized that a breach of any of the provisions in the Agreement would "cause irreparable damage to [AFS's] business and that such damage will be difficult or impossible to measure."  (Agreement, p. 8 ¶ f.)

43.     Accordingly, Nolan agreed that if he breached any of the obligations under the Agreement, then AFS would be "entitled to an order granting injunctive relief from any court of competent jurisdiction," in addition to other rights and remedies.  (*Id.*)

44.     Nolan also agreed that AFS would be "entitled to an award of reasonable attorneys' fees in the event that [AFS] is successful in an application for injunctive relief or in an action based upon the breach" of any of the terms set forth in the Agreement.  (*Id.*)

### Nolan Breaches His Agreement With AFS

45.     Pursuant to the Agreement, Nolan agreed that after his relationship with AFS terminated, he would: (a) immediately return all AFS Confidential Information to AFS; (b) not solicit AFS customers for one year; and (c) not solicit the sale of products that compete with AFS from any location that is within one mile of his AFS Location (18102 Chesterfield Airport Toad, Suite A, Chesterfield, Missouri) for one year.  (Agreement, p. 4 ¶ j; p. 9–10 ¶ g.)

46.     Nolan's Agreement and his relationship with AFS terminated on July 19, 2023.

47.     As a result, Nolan was required to return all AFS Confidential Information to AFS by July 19, 2023.

48.     Naturally, he also is prohibited from using, possessing, or accessing AFS Confidential Information after July 19, 2023.

49.     Similarly, Nolan is prohibited from soliciting AFS customers, or working for a competing agency within one mile of the AFS Location, until after July 19, 2024.

50.     Unfortunately, Nolan is ignoring his post-termination obligations in several different ways.

51.     First, Nolan retained AFS Confidential Information after July 19, 2023.

52.     On information and belief, Nolan retained AFS Confidential Information to solicit AFS customers on behalf of Sequent Planning, an AFS competitor.

53. Second, Nolan, on behalf of himself and Sequent Planning, is actively soliciting AFS customers to whom he sold AFS products to purchase registered products that compete with those sold by AFS.

54. Third, Nolan on behalf of himself and Sequent Planning, is selling products that compete with AFS products to AFS customers to whom he sold AFS products.

55. Fourth, Nolan is inducing and advising AFS customers to whom he sold AFS products to lapse, surrender, or cancel their coverage with AFS.

56. Specifically, Nolan is soliciting AFS customers by phone, email, text message, and in person to purchase products that compete with AFS products.

57. Furthermore, it is nearly certain that Nolan utilized (and is utilizing) AFS Confidential Information to enable him to engage in these written and verbal solicitations.

58. After the Agreement and his relationship with AFS terminated, Nolan did not return any AFS Confidential Information.

59. Instead, Nolan retained AFS Confidential Information after the termination of the Agreement on July 19, 2023 in order to solicit AFS customers on behalf of himself and his new firm, Sequent Planning.

60. Moreover, Nolan's registrations with FINRA and the U.S. Securities and Exchange Commission show that he retained AFS Confidential Information while working for AFS competitor Sequent Planning.

61. From August 19, 2013, to July 19, 2023, FINRA's Central Registration Depository ("CRD") and the SEC's Investment Adviser Public Disclosure ("IAPD") database identified Nolan as being affiliated with AFS. On July 17, 2023—two days before he terminated his relationship

with AFS, Nolan's registration was transferred to Sequent Planning, LLC. A copy of Nolan's IAPD report is attached as Exhibit B.

62.     Since Nolan's Agreement and relationship with AFS terminated, more than 20 AFS customers have terminated their AFS products and purchased competing products through Sequent Planning.

63.     On August 4, 2023, AFS served Nolan with a letter demanding that he (a) immediately stop soliciting AFS customers; (b) stop selling products that compete with AFS products; (c) identify all AFS customers that he solicited or contacted since July 19, 2023; (d) identify and return all AFS confidential information in his possession or control to AFS; and (e) affirm that he will comply with the duties and obligations he still owes AFS. A copy of AFS's August 4, 2023 letter is attached as Exhibit C.

64.     Nolan ignored AFS's requests but did respond on August 4, 2023 by acknowledging the letter and claiming that all of his files "are/were at my office location." A copy of Nolan's August 4, 2023 email is attached as Exhibit D.

65.     Additionally, a conversation with Nolan occurred on August 8, 2023. During that conversation, AFS asked Nolan whether he was soliciting AFS customers. Nolan responded that AFS "should talk to [Nolan's] lawyer."

66.     Nolan did not deny that he was and is soliciting AFS customers, and he refused to provide his attorney's name or contact information to AFS.

67.     Nolan's statement that AFS "should talk to [Nolan's] lawyer" in response to a question regarding whether Nolan is soliciting AFS customers is a tacit admission that Nolan is, in fact, soliciting AFS customers.

68.     Hence, Nolan's response is an admission that he is selling products that compete with AFS products.

69.     During the August 8, 2023 phone conversation, Nolan also stated that he does not have any AFS Confidential Information and that he "left everything at his former agent's location," but refused to provide his "former agent's" name or address.

70.     Nolan's response that he does not have any AFS Confidential Information is belied by the fact that he has not returned any AFS Confidential Information in his possession, custody, or control and does not address either his illegal retention of AFS Confidential Information or his solicitation of AFS customers.

71.     Consequently, and at this time, it is clear that Nolan refuses to stop soliciting AFS customers and selling registered products that compete with AFS.

72.     Nolan also refuses to cease using AFS Confidential Information, return the Confidential Information he stole from AFS, and compensate AFS for his violations of the Agreement.

73.     Hence, Nolan is ignoring the duties and obligation he owes AFS. He is also ignoring the duties and obligations he owes AFS under the law.

**Irreparable Harm to AFS**

74.     Nolan is harming AFS's legitimate business interests, including its goodwill and customer relationships, by soliciting AFS customers and offering financial products competitive with those offered by AFS.

75.     Moreover, Nolan is still in possession of AFS Confidential Information and the only reason for Nolan to possess AFS Confidential Information is to use AFS Confidential Information on behalf of himself and/or Sequent Planning.

76.     Consequently, it is both probable and imminent that an existing or prospective customer may purchase financial products from Nolan instead of from AFS.

77.     It is also both probable and imminent that AFS's Confidential Information is at significant risk and exposure.

78.     Injury to AFS is therefore both probable and imminent because Nolan clearly intends to continue violating his Agreement and the law.

79.     Accordingly, AFS is suffering irreparable harm and injunctive relief is necessary and appropriate to prevent further damage to AFS.

<u>**COUNT I**</u>
**Breach of Contract**

80.     AFS repeats and realleges each and every allegation contained in paragraphs 1 through 79 of the Complaint, as if fully set forth herein.

81.     On May 16, 2013, Nolan entered into his Agreement with AFS.

82.     The Agreement is a valid and enforceable contract.

83.     Under the Agreement, Nolan promised, for a period of one year following the termination of the Agreement, to not solicit the purchase of products competitive with those sold by AFS to any AFS customer.

84.     Under the Agreement, Nolan promised, upon termination of the Agreement, to immediately return all AFS Confidential Information and property to AFS.

85.     Under the Agreement, Nolan further promised to not use AFS Confidential Information for any purpose other than carrying out the provisions of the Agreement.

86.     The post-termination covenants found in the Agreement are reasonable in scope and duration, and are necessary to protect AFS's legitimate business interests in its Confidential Information, goodwill, and longstanding customer relationships.

87.     AFS has performed all of the duties and obligations it owes Nolan under the Agreement.

88.     Nolan breached the Agreement, and continues to breach the Agreement, by, among other things, soliciting the purchase of competing financial products to AFS customers.

89.     Nolan also breached the Agreement, and continues to breach the Agreement, by, among other things, retaining and using AFS Confidential Information.

90.     AFS has incurred significant damage as a result of Nolan's breach of the Agreement.  Nolan's illegal solicitations and actions damaged and are continuing to damage AFS's goodwill and customer relationships. AFS's damages are in excess of $75,000.00.

91.     Moreover, Nolan's breaches of the Agreement are continuing.  AFS is therefore subject to continuing irreparable harm, economic injury, and damage to its goodwill and customer relationships.

92.     AFS has no adequate remedy at law and, unless injunctive relief is granted, AFS will continue to be irreparably harmed by Nolan's breach of his Agreement in a manner that is not fully compensable by money damages.

93.     AFS therefore requests that this Court grant injunctive relief against Nolan that prohibits Nolan from (a) soliciting AFS customers; (b) soliciting the purchase of products that compete with AFS from within one mile of the AFS Location; and (c) using, accessing, or possessing AFS Confidential Information.

94.     AFS further requests that this Court order Nolan to immediately return all AFS property in the custody, possession, or control of Nolan, including AFS Confidential Information, to AFS.

95.     Finally, AFS is entitled to recover the attorneys' fees and costs AFS incurs as a result of Nolan's breaches of the Agreement.

## COUNT II
**(Misappropriation of Trade Secrets –Missouri Uniform Trade Secrets Act)**

96.      AFS repeats and re-alleges each and every allegation contained in paragraphs 1 through 95 of the Complaint, as if fully set forth herein.

97.     During the course of his relationship with AFS, Nolan was exposed to substantial amounts of AFS Confidential Information.

98.     For instance, Nolan had access to AFS customers' personal data, date of birth, social security numbers, types of products, amount of insurance, premium amounts, renewal dates, description and location of assets and property, claims histories, financial needs, pricing information, and other financial and personal information.

99.     Nolan has retained AFS Confidential Information so he could take that information to AFS competitor Sequent Planning.

100.    The Confidential Information identified in paragraphs 27, 36, 38, and 98 is not available to the general public and is closely guarded by AFS.  AFS keeps such information strictly confidential in order to maintain an advantage in the highly competitive financial services business.

101.    This information is considered a trade secret under the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. §§ 417.450–.467 (2011), because AFS derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

102.    The economic value of the AFS trade secrets that Nolan had access to under the Agreement is over $500,000.

103.    Under the MUTSA, "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined."  Mo. Rev. Stat. § 417.455.

104.    Nolan is misappropriating AFS trade secrets by refusing to return AFS property, including AFS Confidential Information, and using that information to solicit AFS customers.

105.    Upon information and belief, Nolan's refusal to return AFS property, including AFS Confidential Information, constitutes the "threatened" misuse of AFS trade secrets and injunctive relief is therefore appropriate.

106.    Accordingly, AFS requests that this Court enter an order enjoining Nolan from using any AFS Confidential Information, and from disclosing AFS Confidential Information to anyone not authorized to receive the Confidential Information.

107.    AFS also requests that this Court enter an order requiring Nolan to return any and all AFS Confidential Information to AFS, as he is required to do pursuant to the Agreement.

108.    In addition, Nolan's actions have damaged AFS's goodwill, reputation, and legitimate business interests.

109.    AFS is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

110.    Finally, Nolan's misappropriation of AFS's trade secrets was willful and malicious.

111.    AFS therefore also  requests an award of compensatory damages, exemplary damages, and reasonable attorneys' fees as a result of Nolan's willful and malicious misappropriation of AFS trade secrets.

## COUNT III
### (Violation of Federal Defend Trade Secrets Act)

112.   AFS repeats and realleges paragraphs 1 through 111 of the Complaint, as if fully set forth herein.

113.   During the course of his relationship with AFS, Nolan was provided access to substantial amounts of AFS Confidential Information, including the Confidential Information identified in paragraphs 28, 36, 388, and 988.

114.   AFS Confidential Information is not available to the general public and is closely guarded by AFS. AFS keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

115.   AFS Confidential Information is considered a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* ("DTSA"), because the information is not generally known outside of AFS's business, the information is not generally known by employees and others involved in AFS's business, AFS has taken reasonable measures to guard the secrecy of the information, the information is of great value to AFS and its competitors, AFS invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because AFS continuously uses the information in its business.

116.   Nolan was under a contractual obligation to return AFS Confidential Information to AFS immediately upon termination of his Agreement.

117.   Nolan, however, ignored (and continues to ignore) his contractual obligations by maintaining possession of AFS Confidential Information, using the Confidential Information to unfairly compete with AFS, and passing the Confidential Information along to third parties who are not authorized to receive, possess, or access AFS Confidential Information.

118.    Unless restrained, Nolan will continue to use, divulge, disclose, acquire and/or otherwise misappropriate AFS Confidential Information.

119.    Furthermore, actual or threatened misappropriation of Confidential Information may be enjoined under the DTSA.

120.    It is axiomatic that if Nolan is actively using AFS Confidential Information and ignoring the terms of the Agreement, then Nolan has no intention of complying with the DTSA.

121.    Consequently, Nolan's actions constitute the actual and/or threatened misuse of AFS Confidential Information.  Injunctive relief against Nolan is therefore appropriate.

122.    Naturally then, AFS requests an order enjoining Nolan from using AFS Confidential Information and from disclosing AFS Confidential Information to anyone not authorized to receive the Confidential Information.

123.    AFS further requests an order requiring Nolan to return any and all AFS Confidential Information to AFS.

124.    Finally, Nolan's misappropriation of AFS Confidential Information has been willful and malicious, and AFS has incurred significant damages as a result of Nolan's misappropriation.

125.    Nolan's actions have also damaged AFS's good will, reputation, and legitimate business interests.

126.    AFS is therefore entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from Nolan's wrongful misappropriation of AFS confidential information.

### COUNT IV
### (Tortious Interference)

127.    AFS repeats and realleges paragraphs 1 through 126 of the Complaint, as if fully set forth herein.

128.    Nolan was and is aware of the contractual relationships between AFS and AFS's customers, as well as AFS's expectancy in developing relationships with potential customers.

129.    Nolan knew and understood that AFS's contractual relationship with its customers would continue after his Agreement terminated.

130.    Pursuant to the Agreement, Nolan was obligated not to solicit or otherwise interfere with AFS's customer relationships for a period of one year after the termination of the Agreement.

131.    Nevertheless, Nolan solicited AFS customers after his Agreement terminated in order to have AFS customers terminate their relationships with AFS.

132.    Hence, Nolan knowingly, intentionally, willfully, and maliciously interfered with AFS's customer relationships within a year of his termination.

133.    Nolan's conduct was not privileged or justified.

134.    AFS has incurred significant damages as a result of Nolan's interference with AFS's contractual relationships.  AFS has suffered the loss of customers and potential customers.  Nolan's actions have also damaged AFS's goodwill, reputation, and legitimate business interests.

135.    As a direct and proximate result of Nolan's tortious interference, AFS has been damaged in an amount to be determined at trial and is entitled to the recovery of punitive damages as well.

**WHEREFORE**, Plaintiff Allstate Financial Services, LLC respectfully requests that this Court:

1.    Enter a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Nolan, and his agents, representatives, associates, employees, and all those acting in concert or participation with him, from:

      (a)    soliciting the purchase of products competitive with those offered by AFS from within one mile of 18102 Chesterfield Airport Road, Chesterfield, Missouri;

      (b)    soliciting the purchase of products competitive to those offered by AFS from any person he serviced or knew of through his relationship with AFS; and

      (c)    using, accessing and/or possessing AFS Confidential Information.

2.    Enter an order requiring Nolan to return all AFS Confidential Information and property in his possession, custody, or control to AFS;

3.    Enter judgment against Nolan for compensatory damages in an amount to be determined at trial;

4.    Award AFS the costs and expenses, including reasonable attorneys' fees, AFS incurs as a result of Nolan's breach of his Agreement and tortious interference;

5.    Award AFS the costs and expenses, including reasonable attorneys' fees, AFS incurs as a result of Nolan's intentional, willful, and wanton violation of the Federal Defend Trade Secrets Act and Missouri Uniform Trade Secrets Act;

6.    Award AFS punitive damages resulting from Nolan's intentional, willful, and wanton violation of the Federal Defend Trade Secrets Act and Missouri Uniform Trade Secrets Act;

7.    Award AFS punitive damages resulting from Nolan's tortious interference with AFS's contractual relationships with its customers; and

8.    Award AFS such other relief as the Court may deem just and proper.

Dated:  August 16, 2023                    Respectfully submitted,

*/s/ Paul A. Del Aguila*
PAUL A. DEL AGUILA (MO Bar #53145)
J. SCOTT HUMPHREY (*Pro Hac Vice Forthcoming*)
KATIE M. BURNETT (*Pro Hac Vice Forthcoming*)
**Benesch, Friedlander, Coplan & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  312.212.4949
Facsimile:  312.767.9192
Email:  pdelaguila@beneschlaw.com
        shumphrey@beneschlaw.com
        kburnett@beneschlaw.com

*Attorneys for Plaintiff Allstate Financial Services, LLC*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 16th day of August, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing, and attach same for service on the following:

Michael P. Nolan
5075 Clayridge Drive, Apt. 202
St. Louis, MO 63129

*/s/ Paul A. Del Aguila*
Paul A. Del Aguila

*One of the Attorneys for Plaintiff Allstate
Financial Services, LLC*

## **<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey Stewart, on behalf of Plaintiff Allstate Financial

Services, LLC, verify under penalty of perjury that the foregoing statements in the Verified

Amended Complaint are true and correct to the best of my knowledge, information and belief.

eSigned by Jeff Stewart

_____

Jeffrey Stewart

Dated:  August <u>15</u>, 2023